**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000801
24-FEB-2017
08:31 AM**

NO. CAAP-14-0000801

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

GINA GILLUM, Appellant-Appellant, v.
STATE OF HAWAIʻI, DEPARTMENT OF HUMAN SERVICES,
Appellee-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 13-1-0532-02 RAN)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Leonard and Ginoza, JJ.)

In this secondary appeal, Appellant-Appellant Gina

Gillum (**Gillum**) appeals from the Judgment (**Judgment**) entered in

favor of Appellee-Appellee State of Hawaiʻi Department of Human

Services (**DHS**), on April 3, 2014, in the Circuit Court of the

First Circuit (**Circuit Court**).[1]  In the proceedings below, a DHS

investigation determined that Gillum neglected an 81-year-old

woman (**Client or Client A**) at Gillum's community care foster

family home (**CCFFH**).[2]   Based on its determination of caregiver

---

[1]     The Honorable Rhonda A. Nishimura presided.

[2]     A community care foster family home is "a home issued a
certificate of approval by [DHS] to provide, for a fee, twenty-four-hour
living accommodations, including personal care and homemaker services, for not
more than two adults at any one time, at least one of whom shall be a medicaid
recipient, who are at the nursing facility level of care, are unrelated to the
foster family, and are being served in the home by a licensed home and
community-based case management agency."  Hawaiʻi Administrative Rules (**HAR**)
§ 17-1454-2 (2005).

neglect, DHS revoked Gillum's CCFFH certificate. After an evidentiary hearing, a hearing officer submitted two Notice of Administrative Hearing Decisions (**Hearing Decisions**), which concluded that DHS had correctly confirmed neglect and revoked Gillum's CCFFH certificate. The Circuit Court affirmed the Hearing Decisions.

On appeal, Gillum argues that the Circuit Court erred when it affirmed the Hearing Officer's conclusions that: (1) Gillum engaged in abuse, and (2) DHS correctly revoked Gillum's CCFFH certificate. Gillum asks this court to vacate the Judgment and the Order Affirming Administrative Hearing Decision Dated January 25, 2013 (**Order**), and remand the case for further proceedings. We affirm.

I.   BACKGROUND

Client was admitted to Gillum's CCFFH on June 18, 2012. On July 16, 2012, the Adult Protective and Community Services Branch of DHS (**APS**) received a report alleging that Client had fallen and sustained a broken hip on June 24, 2012 (**Abuse Report**). The Abuse Report included a statement from Client's daughter (**Daughter**), who reported that Gillum had informed her that she had left Client alone in the bathroom in order to check on other residents. Gillum told Daughter that Client "was in a lot of pain and when [Gillum] tried to lift [Client] up, [Client] screamed." The Abuse Report was accepted for investigation by DHS, and an APS social worker conducted an investigation.

On July 17, 2012, APS visited Gillum's CCFFH to interview Gillum about Client's fall. Gillum explained that on

2

the morning of June 24, 2012, she assisted Client with "her toileting." Gillum informed Client that she needed to go to the bathroom herself, and instructed Client to remain seated. Gillum related that Client assured her that she would remain seated. Shortly after leaving Client, Gillum heard a loud sound. Gillum returned to Client's room and found Client on the ground. Gillum related that she did not call 911 because Client stated that she did not need to go to the hospital. Gillum lifted Client from the floor and Client stated that her left hip hurt; Gillum and her aunt then transported Client to a hospital by car.[3] Gillum reportedly told the APS workers that she should not have left Client alone, and that she should have asked her mother, who was at home but asleep, to supervise Client.

On the same day, APS visited Case Management Professionals (CMP) to review records. Pursuant to Client's service plan, Client needed standby assistance and was to be supervised at all times. The service plan also provided that Client had a history of falls, Alzheimer's disease, and poor short term memory. The service plan identified Client's "potential for falls and injuries due to: weakness/fatigue, unsteady gait, cognitive impairment/dementia, history of falls, and orthostatic hypotension." The corresponding "goal/outcome statement" for Client's potential for falls was that: (1) Client would remain home safely and will not suffer falls or injuries on a daily basis; (2) Client would be supervised at all times, and

---

[3] Client's health condition deteriorated further in the hospital, she was transferred to hospice care on July 10 or 11, 2012, and she died on July 14, 2012.

(3) Client was to sit up slowly and sit for awhile before standing.

Following the investigation, DHS issued a Notice of Disposition Adult Protective Services Investigation (**Notice of Disposition**) on July 24, 2012.  The Notice of Disposition confirmed caregiver neglect by Gillum under HAR § 17-1421-9.1(c) (2009).

On July 24, 2012, DHS and Community Ties of America, a case management, therapy and consulting service provider, notified Gillum via letter that her CCFFH certificate was revoked in accordance with HAR § 17-1454-11.1(c) (2005).  The letter informed Gillum that she was in violation of HAR § 17-1454-7.1 (2005) based on DHS's confirmation of caregiver neglect.  The letter provided that Gillum had the right to appeal DHS's decision.

On October 17, 2012, Gillum requested an administrative hearing to contest DHS's determination of caregiver neglect.  On November 8, 2012, DHS issued its Notice of Hearing notifying Gillum that the hearing was scheduled for November 27, 2012.  On November 27, 2012, an administrative hearing (**Hearing**) was held before Charles H. Hurd (**Hearing Officer**).  The issues before the Hearing Officer were whether DHS correctly (1) confirmed the allegation of caregiver neglect, and (2) revoked Gillum's CCFFH certificate.

Liza Badua-Dumbrique (**Badua**), an APS Social Worker, presented evidence on behalf of APS.  Badua read portions of the November 1, 2012 Internal Communication Form (ICF) into the

4

record.  Badua stated that DHS's position is that Client meets the definition of a vulnerable adult, and that Gillum committed neglect because she did not properly supervise Client.  Badua explained that Client's service plan "clearly states that Client A is to be supervised at all times and is susceptible to falls." Client's service plan also provides that the "on-call RN was to be contacted in case of urgent matters."  Badua noted that Gillum did not notify the case manager of Client's fall and hospitalization until the day after Client's fall.

Badua also read portions of the September 4, 2012 ICF into the record.  Badua stated that DHS's position is that it correctly revoked the CCFFH certificate under HAR § 17-1454-11.1. Badua explained that when a "caregiver has been determined by APS to be a perpetrator of adult abuse, DHS must take action to protect the vulnerable adults in the CCFFH program[.]"

Gillum's counsel also questioned Badua.  Badua related that she did not review Client's autopsy because she was investigating the "neglect part[.]"  Badua explained that a level one patient is one who needs "assistance with certain daily living skills or activities."  Badua related that Client "[n]eeded assistance with toileting . . . [and that] she needed a walker."  Badua explained that a level two patient required a "higher level of care, with the client being fed, being on the bed, feeding."  Badua reiterated that Client's service plan "states that [Client] should be supervised at all times."

Rainbow Aquino (**Aquino**) also testified at the Hearing. On the day of Client's admission, Aquino conducted a three hour

5

assessment. As part of her assessment, Aquino questioned Client about her children and current location. Aquino testified that Client was not able to recall the number of children she had, and also "did not know that she was in a foster home or what city she was in." Aquino testified that she discussed Client's dementia and fall history with Gillum prior to Client's admission. Aquino also informed Gillum that Client needed "supervision and total assistance[.]" Aquino explained that Client needed assistance ambulating due to her risk of falls caused by orthostatic hypotension. Aquino provided Gillum with a copy of Client's service plan. When asked, "[w]as Ms. Gillum informed that the client needed supervision while on the toilet[,]" Aquino responded "[n]ot in that exact words. My teaching was more on the overall bigger picture, not specifically just sitting on the toilet. . . . [Client] needs supervision with her transferring and ambulation." When asked "if the client was told to remain on the toilet, would she remember to remain on the toilet, given that she has dementia," Aquino answered in the negative. Aquino related that Gillum could have asked another person to supervise Client while she was on the toilet.

Sandra Joy Eastlack (**Eastlack**), a DHS program specialist, also testified at the Hearing. Eastlack related that the basis for revocation of Gillum's CCFFH certificate was DHS's determination of caregiver neglect. Eastlack related that if the finding of caregiver neglect was erroneous, then the revocation of the CCFFH certificate would also be erroneous.

Kimberly Hayashi (**Hayashi**), an APS Registered Nurse, also testified at the Hearing. Hayashi and Badua interviewed Gillum on July 17, 2012. In the interview, Gillum reported that she informed Client that "she had to use the restroom and to just sit and wait for her[.]" Hayashi noted that Client was "given a bell to use when she needs assistance. . . . but [Client didn't] like the bell[.]" Hayashi related that Client had "diagnoses of dementia and low blood pressure, extremely low blood pressure with movement changes, as well as her oral intake was severely poor[.]" Hayashi explained that orthostatic hypotension is a "sudden decrease with movement of blood pressure which causes dizziness[.]" Given Client's orthostatic hypotension, dementia, poor eating habits, and the presence of substitute caregivers, Hayashi testified "that there were options available to have prevented [Client's] fall that occurred in the restroom."

Gillum also testified at the Hearing. Gillum related that she had cared for seven or eight patients in her CCFFH over the course of nine years. Prior to Client's admission, Gillum testified that she was not aware of Client's history of falls. Gillum stated that she would not have admitted Client had she known about Client's history of falls. Gillum related that Aquino informed her of Client's diagnosis and medication. Gillum stated that Aquino did not discuss Client's service plan. Gillum also testified that she admitted Client without reading Client's service plan. Gillum did not review Client's service plan during the six days between Client's admission and her fall. Prior to Client's fall, Gillum was aware that Client suffered from

7

dementia, impaired memory, weakness, unsteady gait, hypotension, and dizziness. Gillum was also aware that Client required more care than a level one patient.

On the morning of the fall, Gillum entered Client's room and asked if she needed to use the bathroom. While Client was on the toilet, Gillum had an urge to use the bathroom. Gillum instructed the Client to ring the bell if she needed help, and Client responded that she would call for Gillum because the bell was too loud. Prior to this day, Gillum related that Client "normally" followed her instructions. Gillum then placed the walker and bell in front of Client, and left to use the bathroom. Shortly thereafter, she heard a bang. Gillum related that Client did not call for help or ring the bell. When Gillum arrived at Client's room, she saw Client on the floor lying down. Gillum and her mother helped Client into her wheelchair and then placed her in bed. Gillum informed Client's daughter that she was taking Client to the emergency room. Gillum testified that she called her agency the day after Client's fall. When asked, "[p]rior to the fall, did [Client] ever exhibit anything that you would have a concern to just leave her alone in a sitting position for a few minutes[,]" Gillum answered in the negative.

On January 25, 2013, the Hearing Officer issued the Hearing Decisions. The Hearing Officer determined that DHS properly confirmed that Gillum had committed caregiver neglect. The Hearing Officer concluded that DHS correctly revoked Gillum's CCFFH certificate under HAR §§ 17-1421-2 (2009), 17-1454-41 (2005), and Hawaii Revised Statutes (HRS) § 346-222 (2015).

On February 22, 2013, Gillum filed a Notice of Appeal to Circuit Court. After briefing, oral argument was held on February 28, 2014. Gillum's counsel asserted that the Hearing Officer's decision was clearly erroneous in view of the reliable, probative, and substantial evidence. Gillum's counsel argued that there "was nothing instructed to [Gillum] that [Client] must be supervised at all times while seated[.]" DHS contended that Client's service plan indicated that Client suffered from "weakness, fatigue, unsteady [gait], cognitive impairment, dementia, [and] history of falls." The Circuit Court orally affirmed the Hearing Officer's decision "in finding caregiver neglect under these circumstances, given the service plan, given as to where the incident occurred."

On April 3, 2014, the Circuit Court entered the Order, which included that the "hearing officer's decision to affirm DHS' confirmation of caregiver neglect by Ms. Gillum is supported by the reliable, probative, and substantial evidence in the record[.]" On the same day, the Circuit Court entered the Judgment. Gillum filed her notice of appeal on May 2, 2014.

II. POINTS OF ERROR

Gillum argues that the Circuit Court erred when it affirmed the Hearing Officer's conclusions that: (1) Gillum engaged in abuse, which includes caregiver neglect; and (2) DHS correctly revoked Gillum's CCFFH certificate.

III. APPLICABLE STANDARD OF REVIEW

"The review of a circuit court's decision regarding its review of an administrative agency's decision is a secondary

appeal." <u>Pilaʻa 400, LLC v. Bd. of Land & Nat. Res.</u>, 132 Hawaiʻi 247, 262, 320 P.3d 912, 927 (2014) (citing <u>Haw. Teamsters & Allied Workers, Local 966 v. Dep't of Labor & Indus. Relations,</u> 110 Hawaiʻi 259, 265, 132 P.3d 368, 374 (2006)).

"On secondary judicial review of an administrative decision, Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court." <u>Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations</u>, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988). For administrative appeals, the applicable standard of review is set forth in HRS § 91-14(g) (2004), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1)    In violation of constitutional or statutory provisions; or

(2)    In excess of the statutory authority or jurisdiction of the agency; or

(3)    Made upon unlawful procedure; or

(4)    Affected by other error of law; or

(5)    Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6)    Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to HRS § 91-14(g)(5),

administrative findings of fact are reviewed under the clearly erroneous standard, which requires [the appellate] court to sustain its findings unless the court is left with a firm and definite conviction that a mistake has been made. Administrative conclusions of law, however, are reviewed under the de novo standard inasmuch as they are not binding on an appellate court. Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency. To be granted deference, however, the agency's decision must be consistent with the legislative purpose.

<u>Peroutka v. Cronin</u>, 117 Hawaiʻi 323, 326, 179 P.3d 1050,

1053 (2008) (citations and internal quotation marks omitted).

AlohaCare v. Ito, 126 Hawai'i 326, 341, 271 P.3d 621, 636 (2012) (brackets in original).

IV. DISCUSSION

    A.    Caregiver Neglect

    Gillum argues that the Circuit Court erred when it affirmed the Hearing Officer's conclusion that she engaged in abuse. DHS submits that the confirmation of caregiver neglect is supported by the reliable, probative, and substantial evidence in the record.

    In the Hearing Decisions, the Hearing Officer determined that DHS properly confirmed that Gillum had committed caregiver neglect as defined by HRS § 346-222 and HAR § 17-1421-2 because she failed "to provide the required care, as a reasonable caregiver would have done and as specified in Client A's personal service plan, to which [Gillum] had committed in accepting Client A as a resident in [Gillum's] CCFFH."

    HAR § 17-1421-2 specifies that the terms "caregiver neglect" and "vulnerable adult" shall be construed as defined in HRS § 346-222. HRS § 346-222 defines "caregiver neglect" and "vulnerable adult" as:

> "Caregiver neglect" means the failure of a caregiver to exercise that degree of care for a vulnerable adult that a reasonable person with the responsibility of a caregiver would exercise within the scope of the caregiver's assumed, legal or contractual duties, including but not limited to the failure to:
>     (1)    Assist with personal hygiene;
>     (2)    Protect the vulnerable adult from abandonment;
>     (3)    Provide, in a timely manner, necessary food, shelter, or clothing;

(4)    Provide in a timely manner, necessary health care, access to health care, prescribed medication, psychological care, physical care, or supervision;

(5)    Protect the vulnerable adult from dangerous, harmful, or detrimental drugs, as defined in section 712-1240; provided that this paragraph shall not apply to drugs that are provided to the vulnerable adult pursuant to the direction or prescription of a practitioner, as defined in section 712-1240;

(6)    Protect the vulnerable adult from health and safety hazards; or

(7)    Protect the vulnerable adult from abuse by third parties.

. . . .

"Vulnerable adult" means a person eighteen years of age or older who, because of mental, developmental, or physical impairment, is unable to:

(1)    Communicate or make responsible decisions to manage the person's own care or resources;

(2)    Carry out or arrange for essential activities of daily living; or

(3)    Protect oneself from abuse, as defined in this part.

Gillum also contends that DHS's position that she was required to supervise Client at all times is contradicted by specific intervention requirements in the service plan.

Gillum contends that the Hearing Officer's decision is not supported by reliable, probative, and substantial evidence. In particular, Gillum argues that she did not act negligently because she had no prior knowledge that Client would not follow instructions to stay in a seated position on the bathroom toilet. Gillum asserts that she was not informed by Aquino or Client's family members that Client was at risk when in a seated position. In essence, Gillum challenges the Hearing Officer's assessment of the testimony and service plan, and asks the court to reweigh the evidence and reassess the credibility of witnesses presented at the Hearing.

"An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld." In re Hawaii Elec. Light Co., 60 Haw. 625, 630, 594 P.2d 612, 617 (1979) (citing HRS § 91-14(g) (1976)). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Jou v. Schmidt, 117 Hawai'i 477, 482, 184 P.3d 792, 797 (App. 2008) (citation omitted). Furthermore,

> [i]t is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

Moi v. Dep't of Pub. Safety, 118 Hawai'i 239, 242, 188 P.3d 753, 756 (App. 2008) (quoting Nakamura v. State, 98 Hawai'i 263, 268, 47 P.3d 730, 735 (2002)).

At the Hearing, Aquino testified that she provided Gillum with a copy of Client's service plan. The service plan identified, *inter alia*, Client's "potential for falls and injuries due to: weakness, fatigue, unsteady gait, cognitive impairment/dementia, history of falls, and orthostatic hypotension."

Aquino testified that she discussed Client's dementia and fall history with Gillum prior to Client's admission. Aquino also testified she informed Gillum that Client needed "supervision and total assistance[.]" Aquino explained to Gillum that Client needed assistance ambulating due to her risk of falls caused by orthostatic hypotension.

Gillum testified that Aquino informed her of Client's diagnosis and medication, but did not discuss the specifics of Client's service plan. Gillum also testified she admitted Client into her care without reviewing the service plan and did not review the service plan during the six days between Client's admission and her fall. Gillum said that it was only after Client's fall that she became aware of Client's history of falls.

The Hearing Officer found Aquino's testimony, specifically her testimony regarding the review of the service plan, to be credible. The Hearing Officer also determined that Gillum's "lack of recollection about the same service plan review on June 18, 2012 is not credible." The Hearing Officer concluded that Gillum was "adequately informed about Client A's risk of falling and should have had this in mind, as would a reasonable person in a caregiving role, when [Gillum] was dealing with Client A on the morning of June 24, 2012." Additionally, the Hearing Officer determined that:

> [Gillum] chose not to awake her substitute caregivers, her mother and her aunt, or other members of the household, as she was beginning her day with the toileting of Client A. This choice not to awake others for help with Client A, when [Gillum] was experiencing some stomach ache, was a decision that lacked good common sense; moreover, [Gillum's] story that she set the bell near Client A on that morning does not ameliorate the poor quality of [Gillum's] choices, for she herself stated that Client A didn't like the bell and had said to [Gillum] that she (Client A) didn't want to use it. [Gillum's] reliance on such poor alternatives are a faint gesture toward quality care - especially when it would've been quite easy to call her mother for help, before [Gillum] went to the second bathroom herself. [Gillum's] choices underscore that [Gillum] was simply not mindful of her duties to provide quality care to Client A, to which she was committed by virtue of the job she had undertaken.

> Finally, [Gillum] did not properly handle the situation she confronted, when she returned to Client A's bathroom to find Client A lying on her left side. [Gillum] described to Client A's daughter, that Client A had "screamed" in pain, when [Gillum] telephoned [Client A's daughter] a short time after Client A's fall. This Hearing

> Officer finds that [Gillum's] later denial [of] this statement is not credible. The condition of Client A was not properly assessed before [Gillum] moved the patient, with the help of [Gillum's] mother, by lifting Client A back to her bed. [Gillum] should have immediately called 911 and covered Client A to keep the patient warm. [Gillum's] choice, once again was wanting and in this regard, is a separate and sufficient reason to find that she was neglectful of her patient's wellbeing.

We decline to disturb the Hearing Officer's assessment of the credibility of the witnesses and the weight given to the evidence. Moi, 118 Hawai'i at 242, 188 P.3d at 756. Viewing the reliable, probative, and substantial evidence, with the Hearing Officer determining credibility, we cannot conclude that the Hearing Officer erred when he determined that Gillum committed caregiver neglect.

B.   CCFFH Certificate

Gillum argues that the Circuit Court erred when it affirmed the Hearing Officer's conclusion that DHS correctly revoked her CCFFH certificate. Gillum fails to cite to any authority to support her argument. This is insufficient under Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7), and we deem this argument waived. See HRAP Rule 28(b)(7) (stating that the opening brief should include an argument section "containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on", and that "[p]oints not argued may be deemed waived"). In addition, Gillum's argument concerning the CCFFH Certificate relies on her argument that the Hearing Officer erred when he concluded that she committed caregiver neglect. As we have found no error in the determination of

caregiver neglect, we conclude that Gillum's argument concerning revocation of her CCFFH Certificate is also without merit.

V.    CONCLUSION

For these reasons, we affirm the Circuit Court's April 3, 2014 Judgment.

DATED: Honolulu, Hawai'i, February 24, 2017.

On the briefs:

Shawn A. Luiz,
for Appellant-Appellant.

Heidi M. Rian,
Candace J. Park,
Deputy Attorneys General,
for Appellee-Appellee.

Chief Judge

Associate Judge

Associate Judge